UNITED STATES v. 3.544 ACRES OF LAND, MORE OR LESS, SITUATE IN PHILADELPHIA COUNTY, PA.

CITY OF PHILADELPHIA v. UNITED STATES.

No. 8593.

Circuit Court of Appeals, Third Circuit.

Argued Oct. 5, 1944.

Decided Feb. 8, 1945.

[5] United States v. Alaska S. S. Co., 253 U.S. 113, 40 S.Ct. 448, 64 L.Ed. 808; Walling v. Shenandoah-Dives Mining Co., 10 Cir., 134 F.2d 395.

Norman MacDonald, of Washington, D. C. (Norman M. Littell, Asst. Atty. Gen., Gerald A. Gleeson, U. S. Atty., of Philadelphia, Pa., C. James Todaro, Sp. Asst. to the Atty. Gen., and Vernon L. Wilkinson, Atty., Department of Justice, of Washington, D. C., on the brief), for appellant.

Joseph P. Gaffney, of Philadelphia, Pa., for appellee.

Before GOODRICH and McLAUGHLIN, Circuit Judges, and KALODNER, District Judge.

## McLAUGHLIN, Circuit Judge.

The property concerned in this condemnation matter is located in the City of Philadelphia. A board of view had previously reported that the owner had sustained damages of $24,808. Both sides then appealed to the District Court from that finding. The District Court trial resulted in a verdict in favor of the owner in the sum of $40,000. Two points are made by the appellant, namely:

1. Whether the District Court erred in refusing to strike the testimony of the landowner's expert real estate witnesses, Messrs. Phillips and Tomlinson, as to the value of the land condemned.

2. Whether there was error in sustaining objections to questions put to the same two witnesses on cross examination, by counsel for the government.

The case turns on the government's motion to strike out the *entire* testimony of Tomlinson, a witness for the landowner. Tomlinson qualified as a real estate expert with knowledge of the particular locality. On direct testimony he said that he based his opinion of the market value of the tract on: examination of the property, its location, description, the surrounding neighborhood, the street improvements, the uses the land could be put to, its most profitable use (which he thought would be for residences) and other sales in the immediate neighborhood. He thought $51,-000 was the market value of the land as of April 21, 1941.

On cross examination, asked how he arrived at that estimate, he stated: "I took the value of so much an acre." Counsel pressed the witness in an endeavor to show that his basis of the valuation was a plan of development, the erection of houses and the subdivision into lots. The witness said, "Naturally in order to set a value on a piece of land, you consider what its best uses are, and I considered the best uses of the ground was for the erection of dwellings, and it is easy enough to ascertain how many dwellings could be built upon the ground." He then explained how he thought a builder would divide the land into lots. Following that, on cross examination he was asked: "Q. Without taking that into consideration you would not have a solid basis for your estimate of value, would you, Mr. Tomlinson?" He explained that "* * * you just can't go look at a piece of land and glance over it and say 'That is worth so much money.' That would be like skylarking or window gazing, or something of the kind. You have got to really give some thought as to what you could do with a piece of land, whether it is an industrial piece of land or a residential piece of land; and I considered in this case that here was a block of land developed up to it, where you would build dwellings upon it." He went on to elaborate on its residential facilities. Following this, still on cross examination, he was asked: "And in your mind, Mr. Tomlinson, you made a calculation of how many lots and how many houses could be built, and you also calculated what their cost per lot was?" This was objected to. The Court allowed the question, saying: "I think I will overrule the objections, but I want to caution the jury that when you come to determine the amount of money to which this plaintiff is entitled, you will determine what you think, from all the testimony in the case, is the fair value of the whole tract, and you will not consider any dividing of the tract into lots or the building of houses. You are to determine what the value of the whole tract is. However, I will overrule the objection at this time and allow this line of testimony only to test the witness as to how he arrived at

his figure, but I am cautioning the jury that when you come to figure and estimate what the verdict should be, you are to find the value of the whole tract, and I am allowing this line of questioning now only to test the witness in what manner he arrived at his estimate."

The witness answered that he would consider the lots in present condition and with necessary future street improvements to be worth $50 a front foot with 1,600 feet of frontage. He testified further along this line by stating what he thought a builder would do with the property. The government then moved to strike out the *entire* testimony of the witness on the ground that the "estimated value given by this witness was based upon the subdivision of this land into building lots." The motion was denied.

[1] There is no conflict here between Federal and State law such as arose in United States v. Certain Parcels of Land and Wainwright, 3 Cir., 144 F.2d 626. Both the Federal and Pennsylvania decisions are in accord, that in arriving at market value, the highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future, is to be considered; and that speculative or conjectural use is to be excluded. Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236; Moudy Mfg. Co. v. Pennsylvania R. Co., 215 Pa. 110, 64 A. 373. In Pennsylvania S. V. R. Co. v. Cleary, 125 Pa. 442, 17 A. 468, 11 Am.St.Rep. 913, the Trial Judge had permitted testimony of subdivision into lots to go to the jury on the question of valuation. The Supreme Court said as to this, 125 Pa. at page 452, 17 A. at page 470:

"The learned judge intended to ,guard this point in his charge to the jury, yet he seems to have left a question to the jury with which they had nothing to do. * * *

"We do not agree with the learned judge that there was any such question for the jury in this case. The jury are to value the tract of land and that only. They are not to determine how it could best be divided into building lots, nor conjecture how fast they could be sold, nor at what price per lot. A speculator or investor, in deciding what price he could afford to pay, would consider the chances and probabilities of the situation as then actually existing. A jury should do the same thing. They are not to inquire what a speculator might be able to realize out of a resale in the future, but what a present purchaser would be willing to pay for it in the condition it is now in. This is a rule that is well settled, and the court should have drawn the attention of the jury to it, so as to have left no room for uncertainty on their part. *They should have been told that they had nothing to do with the subdivision of this tract, the price of the lots, or the probability of their sale; but that they were to ascertain the fair selling value of the land before and after the entry by the railroad company, in order to determine the actual damage done to its owner."* (Emphasis ours.)

In Hamory v. Pennsylvania, etc., R. Co., 222 Pa. 631, 72 A. 227, a witness concededly had made up his estimate of what that property was worth just before the railroad was located, by estimating what it would bring if it had been laid out in building lots and all of the lots had been sold at what he thought lots were worth there. The Supreme Court upheld the exclusion of the testimony because the witness's method of estimating the market value was improper. In Kleppner v. Pittsburgh, etc., R. Co., 247 Pa. 605, 93 A. 765, the estimates of the amount of damages were also made up by dividing the land into lots and fixing the price on which they would sell. The Court held that such testimony should have been stricken out. In Rothenberger v. Reading City, 296 Pa. 423, 146 A. 104, the exclusion from evidence of a plan for subdivision was upheld.

Under the Cleary case, a jury is not allowed to pass upon evidence which speculatively subdivides a tract into lots, with the estimate in reality being the total of the assumed value of the lots. Under the Hamory and Kleppner cases, estimates based solely upon subdivided figures are excluded. Neither situation appears in the instant matter. Tomlinson's testimony was allowed solely for the purpose of seeing how he arrived at his figure and the jury was expressly cautioned that testimony as to subdivision into lots was not to be considered by them in determining the amount to which plaintiff was entitled. Later, in the charge, the Court further emphasized this, saying: "On cross examination witnesses on both sides were permitted by the Court to be examined

concerning the development for which the property is adapted. This, of course, was to bring out the testimony as to what this land is best adapted for, but it was also permitted to see if any witness based his estimate on the entire tract exclusively on a basis of individual lots or houses, and if so, his estimate would have to be excluded from the jury; but all the witnesses on both sides testified that their estimates were based on other proper factors, and for that reason the estimates of the four witnesses will all be submitted for your consideration, but let me again caution you that you are to value the tract of land as of April 21, 1941, and that only. You are not to determine how it could best be divided into building lots, nor conjecture how fast they could be sold, nor at what price per lot. You should not inquire what a speculator might be able to realize out of a resale in the future, but you should consider what a purchaser would have been willing to pay for it on April 21, 1941, in the condition it was then in."

▇ The testimony as to lot value was developed at the insistence of the government on cross examination, in the hope or expectation that it would eventually appear as the basis for Tomlinson's estimate. It was permitted, only after repeated objections by counsel for the owner. While the record shows that such lot value was considered by Tomlinson, it does not appear that it was the sole or decisive factor in the formation of his opinion as to market value. In his testimony above referred to, he named a number of other substantial reasons on which he founded his judgment. The questionable evidence as to subdivision into lots, and the value of the latter, might well have been stricken by the Trial Judge on proper motion under the Hamory and Kleppner cases but such motion was never made. The only application was to strike out the entire testimony. This was too broad in scope. We think that in denying the motion as made and instructing the jury as he did, the District Judge disposed of the matter fairly to both sides and in accordance with the legal situation then arising. The decisions support this view. In Wilson v. Equitable Gas Co., 152 Pa. 566, 25 A. 635, a condemnation matter, a number of witnesses testified to the value of the farm in question, before the location of a certain pipe line, *and after basing their opinion on cross examination on its division into building lots.* This division had never actually been made on the ground but was merely plotted on paper and did not correspond with the street as laid out. The pipe line was laid along Spencer Avenue, a street laid out by the City of Pittsburgh across the farm but never opened. Upon the conclusion of the cross examination of each witness, motion was made to strike out the testimony on the ground that the estimate of damage was based upon a subdivision of the property into lots and the effect the construction of the pipe line would have upon the lots in the subdivision of the property; and also, that the streets are to be laid out over the property differently from those located by the city authorities. The motion was denied. The trial thereafter resulted in a verdict and judgment in favor of the plaintiff owner. On appeal, the appellant urged that under the Cleary decision, supra, the Trial Court had erred in refusing to strike the above mentioned testimony. In affirming the judgment, the Supreme Court said, 152 Pa. at page 570, 25 A. at page 636, after citing cases: "In view of these authorities, and especially in view of the fact that the corporation defendant was endeavoring to limit the inquiry to the value of the land as a farm, we think it was competent for the plaintiff to show that a portion of it was ripe for building improvements, or for any other purpose that enhanced its value. The plaintiff's witnesses having testified in chief that the property as a whole was injured in amounts varying from three to eight thousand dollars, we do not think it affected the competency of their testimony that upon their cross-examination it appeared that their judgment was influenced to some extent by the injury the pipe line would cause to certain building lots. It will be noticed that the case lacks the speculative element in [Pennsylvania Schuylkill Valley] Railroad Company v. Cleary, 125 Pa. 442, 17 A. 468 [11 Am.St. Rep. 913]. The evidence does not show that the witnesses based their testimony upon what they supposed the lots might have been sold for, and the price which they would bring after the pipe line was laid. There was no inquiry as to what a speculator might be able to realize out of a resale of the lots in the future. On the contrary, it was an estimate of what the property would be injured as a whole, taking into view the fact that a portion of it was ripe for building purposes."

In Wadsworth v. Water Co., 256 Pa. 106, 100 A. 577, Ann.Cas.1917E, 1099, also involving a land condemnation, the chief error alleged was that the expert witnesses called by the plaintiff to prove the value of his property were allowed to base their respective estimates on the prices paid by the defendant for other lands previously purchased or acquired by it in the course of improvement. The Court said, 256 Pa. at page 115, 100 A. at page 580: "It is true that subsequent cross-examination of some of the plaintiff's experts elicited indications that certain of the sales relied upon by them in making their estimate of the value of the property in controversy were of lands purchased by the defendant in the course of condemnation, and later the uncontradicted testimony produced by the defendant proved such to be the fact; but the assignments of error which complain of the refusal to strike out the objectionable testimony of these experts show the overruling of a motion, which, in effect, was so comprehensive as to include all the evidence given by the witnesses in question; * * *. It may be that most of the experts called by the plaintiff based their estimates upon the improper standard now complained of, yet their evidence indicates that they also considered other relevant and competent sales; therefore, had a prompt motion been made to strike out the incompetent parts of their testimony, the trial judge would have had an opportunity to eliminate the bad and preserve the good, which would still have left the plaintiff some substantial proofs on the question of the value of his land. To have granted the motion when and as made, however, would have prejudiced the plaintiff's case seriously and unwarrantedly."

In Catlin v. Northern Coal & Iron Co., 225 Pa. 262, 74 A. 56, the main contention of the appellant was that "Witnesses at the trial in the court below were permitted to estimate the value of the tract at the time of the entry *upon the basis of a building lot proposition.*" (Italics ours.) The opinion is by Mr. Justice Elkin, who wrote the Hamory decision, supra. In upholding the testimony, he said, 225 Pa. at pages 266 and 267, 74 A. at page 57:

"The first seven assignments go to the question of whether it is proper, in estimating the value of land taken in condemnation proceedings to consider its availability for sale as building lots. Some of our recent cases are relied on to sustain the contention that it is not. Gorgas v. Railroad Co., 215 Pa. 501, 64 A. 680, 114 Am.St.Rep. 974; Hamory v. Railroad Co., 222 Pa. 631, 72 A. 227, are cited for this purpose. What was said in these cases, if not considered in connection with their facts, might appear to give support to the view now earnestly pressed upon us. These cases, however, must be read and understood in view of the situation at the time of the entry. The entry in these cases was made on farm lands in rural districts, and they were not immediately available for sale as building lots. The effort was made to add a fictitious value to the lands entered upon by undertaking to show that they could be divided into lots, and might be sold for building purposes. It was apparent, however, that this was all speculative, and had no real basis in fact. The lands appropriated were farm lands, and in determining their value it was necessary to limit the inquiry to those intrinsic elements of value existing at the time of the appropriation. In the case last cited a witness was asked on preliminary cross-examination if his estimate of what the property was worth at the time of the entry was based upon what it would bring if it had been laid out in building lots, and all the lots had been sold at what he considered them worth, to which an affirmative answer was given. This court held that the method of estimating market value indicated by the answer of the witness was improper. This case was clearly right on its facts. The tract of land had not been laid out in lots. It was farm land. There was no immediate prospect of its being available for sale as building lots, and hence such a method of estimating value would be purely speculative.

"The test in every such case is, What was the market value of the land, at the time of the appropriation, for any available purpose? If it was then available for sale as building lots, and had a market value for such purpose at the time of the entry, it is proper to consider this element of value in determining what the property was then worth. All of our cases recognize that the use to which the land is best adapted may always be considered in estimating market value. If it has immediate value for sale as building lots, it would be a very harsh rule which would deny the owner the benefit accruing to him by reason of having his property so fa-

vorably located. As we view the case at bar, there is no doubt that a considerable portion of the land of appellee was available for sale as building lots, and that it had a market value as such at the time of the entry. Under these circumstances it was proper to consider the present value of the land for this use at the time of the appropriation. Of course future and speculative value as a lot proposition could not be considered, and, as we read the testimony, this rule was not violated."

See also United States v. Waterhouse, 9 Cir., 132 F.2d 699, affirmed by an equally divided Supreme Court, 321 U.S. 743, 64 S.Ct. 484.

■ The appellant further contends that the entire testimony of Phillips, the other real estate expert on behalf of the landowner, should have been stricken out for the same reason as that of Tomlinson. Phillips stated that his opinion of the market value of the land was based upon thorough inspection of the premises, selling prices in the vicinity, knowledge and experience of 37 years, surrounding values, surrounding developments, the facilities to get to the center of the city, transportation, schools, churches, all of those things going to make up the value of a location, value of improvements and best use of the property. He thought the fair market value as of April 1941 was $50,000. In the course of his lengthy cross examination he was asked, "Into how many lots would you subdivide this piece of land?" The question was objected to. Counsel for the government urged that the question be permitted because "on cross examination anything that goes to attacking the credibility of the witness for his competency to make the estimate that he made is relevant if we can show on cross examination of this witness that no builder could profitably develop that land and use it for housing purposes and pay the amount that he has estimated." The Court sustained the objection saying: "I just ruled on your *one* question and that is all." Government counsel then stated: "That was determinative of future cross examination" and he had no further questions. Considering: the reason urged for the allowance of the question; the fact that the cross examination of Phillips as far as it had then proceeded, takes up over twenty pages of the record; the testimony permitted by the Court in the cross examination of Tomlinson, who followed Phillips to the stand; and that the Court's ruling specifically applied only to the single question, we do not see that what the Court did was prejudicial to the government or that the Court unduly limited cross examination. The ruling was not one barring further cross examination or excluding a line of questions. Cross examination is undeniably a right but its proper bounds are within the sound discretion of the Trial Judge. We do not find such discretion abused in the present instance.

■ Appellant states that at the time of the above question, it was becoming plain that Phillips had arrived at his valuation by ascertaining what he believed the property would sell for if subdivided and then discounting that future value to form a conclusion as to its present value. We do not think a fair reading of Phillips' evidence substantiates such conclusion. In any event, no such direct inquiry was attempted. As above indicated, similar direct questions were asked and answered by Tomlinson.

The remaining point of the appellant has to do with the refusal to allow two other questions directed at Tomlinson in cross examination. The first was, "Now, if you built in a row you would cut this piece of land into 100-separate lots, would you not?" Shortly after that had been asked, Tomlinson, having said that the tract was a good place to build moderate price homes, was asked "And what price do you consider to be moderate price?"

■ In subsequent cross examination Tomlinson, in outlining what he thought was the best use for the ground, namely, residences, and what he thought a builder would do, gave details as to the number of lots. Regarding the type of houses, Tomlinson said that he thought such builder would "build on the type of houses to the north already built by the Girard Estate." In other words, both excluded questions were for all practical purposes, answered by Tomlinson's later testimony. There was no prejudice to the appellant as the result of these particular rulings.

A careful examination of the entire record discloses no reversible trial error. The judgment of the District Court is, therefore, affirmed.